HOUSER, Dennis L., and Houser, Natalie A. d/b/a Colonial Theatre Enterprises, Appellants

v.

FOX THEATRES MANAGEMENT CORP.; Fox, Richard; Fox, Donald; Columbia Pictures Industries, Inc.; Abraham A. Dortheimer; Universal Film Exchanges, Inc.; Ciccotta, Pete; Warner Bros. Distributing Corp.; Carroll, Frank; Avco–Embassy Pictures Corp.; Buena Vista Distributing Co., Inc.; Schwartz, Harvey; Filmways Pictures, Inc.; Twentieth Century–Fox Film Corp.; Korte, Louis; Paramount Pictures Corp.; United Artists Corp.

No. 87–5653.

United States Court of Appeals, Third Circuit.

Argued Feb. 29, 1988.

Decided May 9, 1988.

F. Murray Bryan, McNees, Wallace & Nurick, Harrisburg, Pa., Lewis Bernstein (argued), Lewis Bernstein, P.C., Washington, D.C., for appellants.

Judah I. Labovitz (argued), Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for appellees Fox Theatres Management Corp., Richard Fox and Donald A. Fox.

Dennis R. Suplee (argued), David G. Battis, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees Columbia Pictures Industries, Inc., Abraham A. Dortheimer, Universal Film Exchanges, Inc., Pete Ciccotta, Warner Bros. Distributing Corp., Frank Carroll, Avco–Embassy Pictures Corp., Filmways Pictures, Inc., Twentieth Century–Fox Film Corp., Louis Korte, Paramount Pictures Corp., and United Artists Corp.

Before SEITZ, HIGGINBOTHAM and COWEN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal arises from an order of the district court granting summary judgment in favor of the defendants. Upon review, we conclude that the plaintiffs failed to present sufficient evidence in support of their claims that defendant Fox willfully monopolized the exhibition of first-run films in violation of section 2, and that Fox conspired separately with the individual distributor defendants in violation of section 1, of the Sherman Act. Therefore, we will affirm the district court's grant of summary judgment in favor of the defendants.

I.

On any given Saturday night of forty years ago, crowds filled elegant and spacious art deco movie houses in town centers across America to watch such stars as Lauren Bacall and Humphrey Bogart grace the giant silver screen. At that time, Lebanon, Pennsylvania supported five downtown motion picture theaters. Today, reflecting a national trend, the elegant downtown theaters are virtually extinct and have been replaced by smaller modern twin theaters adjacent to suburban shopping centers. By 1983, the greater Lebanon area supported two suburban twin theaters and a drive-in; however, the only operating downtown theater was the State, showing mainly X-rated films. This case arises out of one couple's attempt to restore the grand old Colonial Theater in downtown Lebanon to its former prominence.

The plaintiffs, Dennis and Natalie Houser, purchased the Colonial Theater in 1979. The Colonial is a large, old elegant theater in excellent condition with modern equipment and facilities located in a well-maintained residential section of downtown Leb-

anon. For several years prior to the Housers' acquisition, the Colonial had been operated as a sub-run theater on weekends only.[1] Dennis Houser is an accountant with no prior experience in the motion picture business, except that he had done the books for two prior operators of the Colonial. He acquired the Colonial to pacify an accounting client who had complained about the Housers' participation in the client's initial acquisition of the theater. Natalie Houser also had no experience in operating a motion picture theater. The Housers purchased the Colonial for $21,400 in cash and the assumption of $92,000 in outstanding obligations with full knowledge that the theater was losing money, and that it had not made a profit in several years prior to the acquisition. It was the Housers' intention to re-establish the Colonial as a profitable first-run film theater beginning in May, 1980.[2]

At that time, defendant Fox Theatres Management Corporation, through Richard and Donald Fox ("Fox"), operated two suburban twin theaters located adjacent to shopping centers in the Lebanon area, and a downtown theater. These three Fox Theaters with a total of five screens were the only ones exhibiting first-run films on a full-time basis in the Lebanon area.[3] In December, 1981, Fox closed its downtown theater leaving two suburban twin theaters exhibiting first-run films in Lebanon. These theaters are part of a chain operated by Fox with 81 screens throughout southeastern Pennsylvania, Maryland and Delaware.

In the motion picture industry, each film distributor distributes its pictures in its own way. In this case, most of the distributor defendants have Philadelphia branch offices, run by branch managers, which license films in the Philadelphia exchange territory, including Lebanon.[4] Generally, a branch manager notifies exhibitors in a given area of availability dates for new releases, solicits bids or negotiates licenses directly, and makes any necessary adjustments in agreed-upon rental terms.

The precise pictures and release dates made available to individual theaters is based on such varied factors as the nature of the picture, the distributor's judgment as to whether a particular film is best suited to initial release in larger cities or to "going wide" in a number of towns at the same time, the length of playing time sought by an exhibitor, and the number of prints of a film that will be available. In the Philadelphia exchange, most pictures are offered first in the Philadelphia, Trenton and Wilmington areas. Occasionally, a picture will also open at the same time in relatively large markets such as Harrisburg or Allentown, and might even open simultaneously in such smaller markets as Lebanon.

Once the availability date of a film is set, exhibitors in an area are invited by the distributor either to submit written bids or

---

1. In film distribution parlance, "first-run" refers to the first exhibition of a film in a given geographic area. Where a distributor re-releases a film after the passage of time, its first showing on re-release in a given geographic area is also considered a first-run. "Sub-run" refers to the exhibition of a film in a given geographic area after its first-run.

2. Following their initial purchase of the Colonial in August, 1979, the Housers continued to operate the theater on a sub-run basis on weekends only. In the winter of 1980, they closed the Colonial completely for two months. After resuming sub-run weekend operations in March, 1980, the Housers began to exhibit first-run pictures on a full-time basis in May, 1980.

3. The Key Drive–In located outside downtown Lebanon played both first-run and sub-run movies but was only open from the late spring to early fall. The State Theater located in downtown Lebanon primarily played x-rated films.

4. The distributor defendants include the following companies and individuals: Columbia Pictures Industries, Inc. and Abraham A. Dortheimer, its Philadelphia Branch Manager; Universal Film Exchanges, Inc. and Pete Cicotta, its Branch Manager; Warner Brothers Distributing Corporation and Frank Carroll, its Branch Manager; AVCO Embassy Pictures Corp.; Filmways Pictures, Inc.; Twentieth Century–Fox Film Corporation and Louis Korte, its Branch Manager; Paramount Pictures Corporation; and United Artists Corporation. The original complaint also named Buena Vista Distribution Co., Inc. and Harvey Schwartz, its branch manager, as defendants, but the case against them settled after the entry of the magistrate's report and recommendation.

to negotiate directly for films that interest them. Film rental fees are based on a percentage of each theater's weekly gross receipts, or "box office receipts." Generally, the percentage terms decline from week to week during a film's run and are dependent on the length of playing time offered. Occasionally, an exhibitor engages in "overbooking," which is the usual practice of committing to the exhibition of a film when no screen is available. The purpose of overbooking is to have films on reserve in case the anticipated run of an exhibited film has to be cut short because the film bombs.[5] Overbooking can also occur when a successful film is held over beyond its anticipated run. Sometimes an exhibitor will agree to pay a distributor a guaranteed minimum film rental or advance.

A film distributor's revenues depend directly upon the ability of a theater to attract customers. The decision to license a picture to one theater or another is based on the distributor's evaluation of the probable box office gross at each theater. Estimating a particular theater's grossing potential is a complex judgment call, which depends on such varied factors as the location of the theater, its cleanliness, and its history and reputation as a full-time first-run theater. In assessing grossing potential, a theater's track record regarding past box office receipts and payment history is very important.

---

**5.** A film "bombs" when its box office receipts fall far below the weekly gross receipts anticipated by both the distributor and exhibitor.

**6.** The Housers argue that this period included the "very successful exhibition" of the film "Hangar 18." Brief of Appellants at 7. However, the record reveals that total daily attendance during the 17-day run of Hangar 18 ranged from just 7 to 255, including a substantial number of children's admissions at less than half-price, and exceeded 150 adult admissions on only three days. III App. at 770A–773A.

**7.** During this period, the Colonial exhibited its most successful film in terms of box office receipts—"The Best Little Whorehouse in Texas." However, because the Housers offered a $20,000 guarantee in an attempt to outbid Fox's offer of a $15,000 guarantee, the Colonial still lost money on the picture.

**8.** At the time the theatre was closed, the Colonial had already booked "The Sword in the Stone"

Between May, 1980 and September, 1982, the Housers employed four successive booking agents who attempted to book first-run films at the Colonial with varying success. For example, beginning in May, 1980 until the end of that year, the Colonial successfully booked first-run films during 18 of the 34 weeks.[6] The Colonial either exhibited sub-run films or was closed during the remaining 16 weeks. In another period, beginning in January, 1982 through September, 1982, the Colonial exhibited first-run films in 21 of 36 weeks, but was closed for 14 of those weeks.[7] During this same period, Fox exhibited sub-run films on at least one of its screens during 19 of the 36 weeks. At various times, the Housers were taken off service by two film distributors for failure to pay film rentals. Finally, in September, 1982, the Housers closed the Colonial arguing that they were unable to obtain adequate Fall, 1982 bookings; however, the record indicates that they had already succeeded in booking one first-run film and did not vigorously pursue booking other available films.[8]

During this period between May, 1980 and September, 1982, the Housers presented evidence that Fox engaged in overbooking at its theaters on a significant scale. For example, over the 89 week period from January, 1981 until September, 1982, Fox overbooked to some degree during 63 of

---

for Christmas exhibition. Dennis Houser has identified five other films which he wanted to exhibit in the fall of 1982, but as to which he was unable to get any response from the distributors. As to at least two of the five, the distributors involved claimed never to have received an offer from the Housers' booking agent, Gary Feldman. Mr. Houser has acknowledged that he was having serious difficulties with Feldman's performance in the summer of 1982. As to a third such film, Mr. Houser acknowledges that Feldman told him that the Colonial's offer had been rejected, that the distributor had asked for rebids and that Feldman had neglected to submit a rebid. Mr. Houser has identified at least another forty first-run films available for distribution in September, October, November and December, 1982, which had not been awarded in Lebanon as far as he knew on September 10, but as to which he made no inquiry or offer. *See* I App. 45A.

the 89 weeks. In addition, in the Winter of 1980–81, Richard Fox visited the branch managers of the distributor defendants to tout his theaters and allegedly unfairly disparaged the Colonial's ability to generate good box office results. Finally, in July, 1981, Donald Fox inaugurated a practice of giving gifts to the distributor defendant's branch managers.

On July 28, 1983, the Housers brought this antitrust action pursuant to the Clayton Act, 15 U.S.C. § 15, and sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2.[9] They alleged that Fox Theatres monopolized and attempted to monopolize first-run film exhibition in Lebanon, Pennsylvania in violation of section 2 of the Sherman Act. The Housers also claimed that each of the separate distributor defendants conspired individually with Fox to deny the Colonial first-run films in violation of section 1 of the Sherman Act.

After the completion of discovery, all the defendants moved for summary judgment on September 3, 1985, and the district court referred the motions to a magistrate on November 20, 1985. On July 3, 1986, the magistrate filed his report recommending that summary judgment be granted in favor of all the defendants. On August 12, 1987, the district court entered an order adopting the report of the magistrate, granting judgment in favor of all the defendants.

## II.

In reviewing the district court's grant of summary judgment in favor of Fox and the distributor defendants, we employ the same test the district court applied under Fed.R.Civ.P. 56. In doing so, we must determine whether the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there was no genuine issue as to any material fact, and that Fox and the distributor defendants are entitled to a judgment as a matter of law. *Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564, 568 (3d Cir.1986); *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De Nemours and Co.*, 826 F.2d 1235, 1238–39 (3d Cir.1987); Fed.R.Civ.P. 56(c). Fox and the distributor defendants are not required to refute the affirmative elements of the Housers' claims; instead, they need only point out the absence or insufficiency of the Housers' evidence offered in support of those affirmative elements. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A.

First, we will address the Housers' claim that Fox Theatres, through the defendants Richard Fox and Donald Fox, monopolized and attempted to monopolize first-run film exhibition in Lebanon, Pennsylvania in violation of section 2 of the Sherman Act. Section 2 of the Sherman Act states, in relevant part, that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2 (1982). The offense of monopoly under section 2 has two elements: "(1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

The Housers have presented sufficient evidence in this case to survive Fox's motion for summary judgment related to the first element of a section 2 monopoly offense. We agree with the finding of both

---

**9.** The Clayton Act, as amended, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ..." in federal district court. 15 U.S.C. § 15(a). The Housers initiated this action pursuant to the Clayton Act to recover damages for alleged violations of sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1–2.

the magistrate and district court that the Housers have established first-run films as the relevant product market and Lebanon, Pennsylvania as the relevant geographic market.[10] The next question is whether Fox possesses monopoly power within the relevant market. Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E.I. Du Pont De Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). The Supreme Court has held that the existence of such monopoly power "ordinarily may be inferred from [a] predominant share of the market." *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).[11] The Housers tendered evidence that Fox controlled between 66% and 71% of the screens exhibiting first-run films in Lebanon between May, 1980 and September, 1982. I App. 123A. Therefore, in light of our obligation to draw all reasonable inferences in favor of the Housers, we infer from Fox's predominant share of the market that it possessed monopoly power over the exhibition of first-run films in Lebanon during this period.[12]

The more difficult issue is whether the Housers have met their burden of presenting sufficient evidence related to the second element of a section 2 monopoly offense—proof of the "willful acquisition or maintenance" of monopoly power.

*United States v. Grinnell Corp.,* 384 U.S. at 570–71, 86 S.Ct. at 1704. The Housers' central allegations in support of their claim that Fox willfully maintained its monopoly power are: (1) that Fox actively disparaged the Colonial's box office gross potential to the defendant distributors; (2) that Fox gave excessive gifts to managers of the distributor defendants; and (3) that Fox's practice of allegedly excessive overbooking was a willful attempt to prevent Colonial from becoming a first-run film theater.

The Housers' first two claims are without merit. Based on their own affidavits and an affidavit of one of their booking agents, the Housers argue that Richard Fox visited the distributor defendants in December, 1980 and specifically disparaged the Colonial's grossing potential. Brief of Appellants at 8; I App. 202A–210A. However, the affidavits relied on by the Housers contain inadmissible hearsay, and cannot be considered in the context of a summary judgment motion. Fed.R.Civ.Proc. 56(e) ("supporting and opposing affidavits shall ... set forth such facts as would be admissible in evidence...."). In contrast, Richard Fox testified in a deposition that he confined his conversations with distributors to the general assertion that his theaters were better than the Colonial. XIII App. 4161A–4163A. Even if the Housers' affidavits were admissible, we agree with the district court that Richard Fox's con-

**10.** Fox argues that the Housers failed to meet their burden of coming forward with evidence confining the geographic market to Lebanon, Pennsylvania. Brief of Appellee Fox at 18 n. 6. We disagree. The record supports the conclusion that patrons of first-run films in Lebanon primarily attend Lebanon theaters. I App. 123A, 153A, 216A. The fact that there is evidence that a minority of customers might travel to Harrisburg, Lancaster or even Philadelphia to attend a picture unavailable in Lebanon is not enough to support Fox's contention that the relevant geographic market should be expanded to include those cities as a matter of law. *See Lansdale v. Philadelphia Electric Co.,* 692 F.2d 307, 311 (3d Cir.1982) ("definition of the relevant geographic market ... is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration.").

**11.** In *United States v. Grinnell Corp.,* the Court held that an 87% share of the relevant market

(central station alarm service) constituted monopoly power, 384 U.S. at 571, 86 S.Ct. at 1704, and in *American Tobacco Co. v. United States,* the Court held that "over two-thirds of the entire domestic field of cigarettes, and ... over 80% of the field of comparable cigarettes" constituted "substantial" monopoly power. 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) (cited in *Grinnell,* 384 U.S. at 571, 86 S.Ct. at 1704).

**12.** Fox argues that evidence in the record of Colonial's success in exhibiting some first-run films demonstrates that Fox did not have the power to set prices or exclude competition in Lebanon. Brief for Appellees Fox at 18–22. We agree that a genuine issue of material fact exists as to whether Fox has monopoly power over the exhibition of first-run films in Lebanon. However, based on our review of the record, we cannot rule that Fox lacks monopoly power.

duct was consistent with legitimate competitive conduct.

In addition, the Housers argue that Donald Fox's practice of giving gifts to the distributor defendants supports their claim that Fox willfully maintained monopoly power. It is undisputed that giving gifts is a common practice in the motion picture distribution industry. VIII App. 2561A–2563A; 2675A–2676A; IX App. 2885A; IX App. 3604A–3606A. In fact, the Housers' principal booking agent, Gary Feldman, gave gifts to personnel of the distributor defendants. There is also no evidence suggesting that the distributor defendants favored Fox because of the gifts. Therefore, we also agree with the district court's holding that Fox's practice of giving gifts does not support an inference of anticompetitive behavior.

Finally, in what they acknowledge is the heart of their willful monopolization case, the Housers argue that Fox overbooked films to prevent them from becoming a first-run film competitor. However, there is ample record evidence indicating that overbooking is a common practice throughout the movie industry. VIII App. 2705A–2706A; XIV App. 4516A–4517A; XX App. 6183A–6184A. Overbooking serves the legitimate competitive purpose of having a film on reserve in case the anticipated run of a film has to be cut short because it bombs; sometimes, overbooking results when a successful film is held over beyond its anticipated run. *See* I App. 221A; IX App. 2849A; XII App. 3878A. *See also Movie 1 & 2 v. United Artists Comm.*, 681 F.Supp. 654, 659 (N.D.Cal.1987) (adjusting the length of a film's run is a commonly accepted practice in the movie industry).

The Housers argue that the evidence presented of the existence and extent of Fox's overbooking is sufficient to support the inference that the purpose of the overbooking was to willfully maintain monopoly power.[13] Brief of Appellants at 21–22. We disagree. First, the extent of Fox's overbooking is not great enough to support such an inference. For example, according to the Housers' own calculations, during the 89 week period from January, 1981 until September, 1982, Fox did not overbook at all during 26 of the 89 weeks. Brief of Appellants at 20. In addition, in the context of Sherman Act § 1 conspiracy cases, the Supreme Court has emphasized that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764 (1984). By analogy, we hold that since there is evidence that Fox's practice of overbooking is consistent with sound business practices and permissible competition in this case, it does not, standing alone, support an inference of willful monopolization. Therefore, we will affirm the district court's grant of summary judgment in favor of Fox concerning their alleged violation of section 2 of the Sherman Act.

### B.

◼ Next, we will address the Housers' claim that each of the separate distributor

---

**13.** In support of their argument, the Housers' point to the fact that "Fox submitted no affidavits or testimony" which directly refutes their claim that the purpose of Fox's overbooking was to deny the Colonial first-run films. Brief of Appellants at 20–21. However, Fox is not required to refute the affirmative elements of the Housers' section 2 monopoly claim; instead, they need only point out the insufficiency of the Housers' evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Relying on *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Housers also argue that summary judgment is inappropriate in this case because Fox's motives and intent are critical to a section 2 monopoly case. However, while commenting on *Poller,* the Supreme Court recently emphasized that "[w]e do not understand *Poller* ... to hold that a plaintiff may defeat a defendant's properly supported motion for summary judgment ... without offering any concrete evidence from which a reasonable juror could return a verdict in his favor.... Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

defendants conspired individually with Fox to deny the Colonial first-run films in violation of section I of the Sherman Act. Section I of the Sherman Act makes illegal "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several states...." 15 U.S.C. § 1 (1982). In support of their conspiracy claim, the Housers have the burden of presenting direct or circumstantial evidence that reasonably tends to prove the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). In doing so, the Housers must show "(1) that the defendants acted in contradiction of their economic interests, and (2) that the defendants had a motive to enter into an agreement." *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 208 (3d Cir.1980).

The Housers assert that each of the distributor defendants acted contrary to its economic interests by consistently choosing to license films to Fox theaters rather than the Colonial. They argue that "[o]n a purely objective basis, the Colonial was a better theater than any of the five Fox theaters...." Brief of Appellants at 41. In support of this claim, the Housers point to the Colonial's large seating capacity, elegant and well-maintained condition, and its location in a nice section of downtown in contrast to the alleged "dark and dingy" quality of the narrow suburban twin theaters and the downtown theater owned by Fox. Brief of Appellants at 5–6. In addition, they cite the testimony of a former Twentieth Century Fox employee who stated that he knew of no reason why a picture would not do as well at the Colonial as at the Fox suburban theaters. XIV App. 4579A–4580A. Therefore, the Housers argue that it was in the economic interest of each distributor to encourage greater exhibitor competition in Lebanon by licensing films to the "superior" Colonial.

As we discussed previously, the decision to license a picture to one theater rather than another is based on a complicated subjective estimation of a theater's grossing potential. *See United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 162–64, 68 S.Ct. 915, 931–32, 92 L.Ed. 1260 (1948); *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 882–83 (8th Cir. 1978). Consequently, courts have consistently recognized that motion picture distributors have broad discretion to make licensing decisions based on their own independent judgments. *Paramount Film Distribution Corp. v. Applebaum*, 217 F.2d 101, 124 (5th Cir.1954), *cert. denied* 349 U.S. 961, 75 S.Ct. 892, 99 L.Ed. 1284 (1955); *Universal Amusements Co. v. General Cinema Corp.*, 635 F.Supp. 1505, 1514–16 (S.D.Tex.1985). Such factors as a proven track record of high box office receipts and an unblemished payment history are as important as the seating capacity or aesthetic qualities of a theater when estimating its grossing potential. *See Admiral Theatre Corp.*, 585 F.2d at 885; *Universal Amusements Co.*, 635 F.Supp. at 1517.

It is the Housers' burden to present sufficient evidence to support their claim that the distributor defendants acted contrary to their economic interests in this case. They "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. at 588, 106 S.Ct. at 1357 (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)). However, the Housers point to just a few of the many factors that enter into a distributor's estimate of grossing potential in support of their claim that the Colonial is a better theater than any of the Fox theaters, while ignoring other important factors. For example, both the magistrate and the district court found that the box office receipts for first-run films were consistently higher at the Fox theaters than the Colonial. I App. 29A, 70A–71A. In addition, there is evidence that two of the distributors had prob-

lems collecting money from the Housers. X App. 3129A, 3132A–3134A; VII App. 2217A. In light of the broad discretion that must be given to film distributors in making complex licensing decisions, we hold that there is not enough evidence in this record to permit a factfinder to conclude that the distributor defendants acted contrary to their economic interests by licensing films to Fox rather than the Housers.

Even if we were to assume that the defendant distributors acted contrary to their economic interests, the Housers failed to show that the distributor defendants had a motive to conspire individually with Fox. The Housers allege that the defendant distributors were motivated to conspire with Fox because they feared that Fox might use its "circuit power" and refuse to do business with them throughout southeast Pennsylvania, Maryland and Delaware. The only evidence offered in support of this allegation is the inadmissible hearsay related to Richard Fox's visit to the distributor defendants which cannot be considered by this court, *supra* p. 13, and the fact that Fox owned 81 screens in three states. We agree with the district court's finding that the Housers have not presented any evidence that Fox used circuit power to coerce any of the distributor defendants in their licensing decisions. I App. 30A. Therefore, we will affirm the district court's grant of summary judgment in favor of both Fox and the distributor defendants related to their alleged separate conspiracies in violation of section 1 of the Sherman Act.

### C.

Finally, even if the Housers had been successful in substantiating some antitrust violation, they still must present sufficient evidence to support their claim that they suffered antitrust injury. Clayton Act, 15 U.S.C. § 15 (1982); *see Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) ("[p]laintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent

and that flows from that which makes defendants' acts unlawful." (emphasis in original)). The district court found that such factors as the Colonial's downtown location, the Housers' inexperience and indebtedness, and a track record of poor box office receipts and missed payments of rental fees supported a finding that the Housers did not suffer antitrust injury in this case. However, since the Housers failed to meet their burden of presenting sufficient evidence of an antitrust violation, we need not address this issue.

### III.

In summary, the Housers failed to present sufficient evidence in support of their claim that Fox willfully monopolized first-run film exhibition in Lebanon, Pennsylvania in violation of section 2 of the Sherman Act. In addition, they failed to present sufficient evidence in support of their claim that the defendant distributors acted contrary to their economic interests, or had a motive to conspire with Fox to restrain trade in violation of section 1 of the Sherman Act. Therefore, we will affirm the order of the district court granting summary judgment in favor of all the defendants.