The **PROCTER & GAMBLE COMPANY,**
Plaintiff and Counterclaim
Defendant,

v.

**PARAGON TRADE BRANDS, INC.,**
Defendant and Counterclaimant.

**Civil Action No. 94–16 LON.**

United States District Court,
D. Delaware.

July 31, 1998.

Robert H. Richards, III, of Richards, Layton & Finger, Wilmington, DE; of counsel: John F. Sweeney, James W. Gould, Richard C. Komson, Seth J. Atlas, of Morgan & Finnegan, New York City; Charles E. Buffon, Timothy C. Hester, Salvatore G. Rotella, Jr., of Covington & Burling, Washington, D.C.; for The Procter & Gamble Company.

James M. Mulligan, Jr., of Connolly Bove, Lodge & Hutz, Wilmington, DE; of counsel: Stephen B. Judlowe, Dennis J. Mondolino, Porter F. Fleming, Michael F. Hurley, of Hopgood, Calimafde, Kalil & Judlowe, New York City; Alan J. Hruska, Richard W. Clary, of Cravath, Swaine & Moore, New York City, for Paragon Trade Brands, Inc.

## *OPINION*

LONGOBARDI, Senior District Judge.

Plaintiff and counterclaim defendant The Procter & Gamble Company, ("P & G"), commenced this action on January 20, 1994, alleging that defendant and counterclaim plaintiff Paragon Trade Brands, ("Paragon"), infringed two P & G patents, Lawson U.S. Patent No. 4,695,278 (the "Lawson" patent) and Dragoo U.S. Patent No. 4,795,454 (the "Dragoo" patent). Paragon answered and denied that its products infringe the Lawson and Dragoo patents and sought a declaratory judgment that these patents are invalid, unenforceable, and not infringed. Paragon also asserted counterclaims for violations of federal antitrust law and the Washington Consumer Protection Act (the "antitrust counterclaim") and for infringement of Pieniak U.S. Patent No. 5,098,423 (the "Pieniak" patent). P & G denied liability for both the antitrust counterclaim and the counterclaim for infringement of the Pieniak patent, and sought a declaratory judgment that the Pieniak patent is invalid, unenforceable, and not infringed.

In a Memorandum Opinion and Order dated March 28, 1996, this Court granted P & G's motion for summary judgment and dismissed the antitrust counterclaim. The Court conducted a bench trial on the other claims and counterclaims from February 3, 1997 through February 20, 1997. In an Opinion and Judgment Order dated December 30, 1997, the Court ruled that Paragon infringed both the Lawson and Dragoo patents; that Paragon failed to establish by clear and convincing evidence that the Lawson and Dragoo patents are invalid; that P & G did not infringe the Pieniak patent; and that P & G demonstrated that the Pieniak claims at issue are invalid as anticipated and obvious, and unenforceable as a result of inequitable conduct. The Court therefore awarded P & G damages on its claims that Paragon infringed the Lawson and Dragoo patents.

Presently before the Court is Paragon's motion for a new trial or to alter or amend the judgment, pursuant to Rule 59 of the Federal Rules of Civil Procedure. In this motion, Paragon raises three grounds on which its asserts it is entitled to relief from the judgment in this case. First, Paragon contends that it is entitled to a modification of the judgment or a new trial because the Lawson patent is invalid in light of newly discovered evidence. Second, it argues that newly discovered evidence creates a material issue of fact as to its antitrust counterclaim. Finally, Paragon asserts that this Court should set aside its ruling on the validity of the Lawson patent based on evidence that was inadvertently omitted from the record in this case.

### I.

Rule 59(a) of the Federal Rules of Civil Procedure permits a party to seek relief from a judgment after its entry via a motion for a new trial or a motion to alter or amend the judgment. The decision on whether or not to grant Rule 59 relief rests within the sound discretion of the trial court. *See, e.g., Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980).

There is no fixed standard that applies to review a Rule 59 motion. 12 James Wm. Moore, *Moore's Federal Practice* § 59.13[1] (3d ed.1998). The standard instead varies depending upon the grounds on which Rule 59 relief is sought. *Id.*

▮ The grounds for granting a motion for new trial or to alter or amend the judgment include the availability of newly discovered evidence and the need to correct clear error of law or to prevent manifest injustice. *Compass Tech., Inc. v. Tseng Laboratories, Inc.*, 71 F.3d 1125, 1130 (3d Cir.1995); *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995); *Mobil Oil Corp. v. Amoco Chemicals Corp.*, 915 F.Supp. 1333, 1377 (D.Del.1994). When a Rule 59 motion for a new trial is premised on newly discovered evidence, the burden is on the movant to demonstrate that the new evidence (1) is material and not merely cumulative; (2) could not have been discovered before trial through the exercise of reasonable diligence and (3) would probably have changed the outcome of the trial. *Compass Tech.*, 71 F.3d at 1130.[1]

▮ A Rule 59 motion may not be used as a vehicle to advance additional arguments that a party could have made before judgment but neglected to do so. *Mobil*, 915 F.Supp. at 1377. As this Court opined:

> Unless the court finds that it would be unjust to enforce the decision rendered, a party will not be permitted to reopen a case for the purpose of introducing evidence to meet the issues raised at trial, when that evidence was available and known to the party at the time of trial. Similarly, a party which has litigated the case under one legal theory generally should not be permitted to reopen in order to introduce evidence in support of another legal theory, or in support of issues not raised by that party at trial. If the party had an opportunity to litigate those issues, but chose not to, it should not be permitted

to prolong the litigation any further. Otherwise, no litigation would end, so long as a creative attorney could develop alternative theories of relief.

*Bell Tel. Laboratories, Inc. v. Hughes Aircraft Co.*, 73 F.R.D. 16, 20 (D.Del.1976) (citations omitted), *aff'd* 564 F.2d 654 (3d Cir. 1977).

## II.

### A.

In its first argument in support of its motion, Paragon asserts that the Court should reconsider its conclusion that the Lawson patent is not invalid pursuant to 35 U.S.C. § 102(g), in light of newly discovered evidence. At trial, Paragon contended that a patent application and invention disclosure of Kenneth Enloe, an inventor working for a competitor of the parties, constitutes a prior invention which anticipates the Lawson patent under section 102(g).[2] The Court held that Paragon failed to establish anticipation by prior invention, finding that Paragon had not demonstrated by clear and convincing evidence that Mr. Enloe did not abandon, suppress, or conceal his prior invention. Paragon asserts that this conclusion is rendered fundamentally flawed by the issuance of Enloe United States Patent No. 5,599,338 (the " '338 patent") on February 4, 1997, the second day of the trial in this action. Paragon argues that the Court should modify its judgment or grant a new trial on this issue because the '338 patent refutes the conclusion that Mr. Enloe abandoned, suppressed, or concealed his prior invention.

The Lawson patent, entitled "Absorbent Article Having Dual Cuffs," describes an integral or unitary disposable absorbent article, such as a diaper, consisting of five elements, a liquid pervious topsheet, a liquid impervious backsheet, an absorbent core, an elastically contractible gasketing cuff, and a barrier leg cuff ("BLC"). *Procter & Gamble*

---

1. In addressing procedural issues not unique to patent law, the Court of Appeals for the Federal Circuit applies the law of the regional circuit where the district court sits. *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1246 (Fed. Cir.1993).

2. Section 102(g) provides that a person shall be entitled to a patent unless "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it."

*Co. v. Paragon Trade Brands,* 989 F.Supp. 547, 563 (D.Del.1997) [hereinafter *P & G* ].[3] The concept of using a second leg cuff, the BLC, to enhance the containment characteristics of a diaper forms the basis of the Lawson patent. *Id.* at 562. The specification of the Lawson patent describes a variety of materials that can be used for the BLC, but indicates that, in its preferred form, the BLC is made using a "liquid impermeable" material. *Id.* at 564. Each of the Lawson claims at issue requires the BLCs to be liquid impermeable. *Id.*

As the Court noted in its December 30, 1997 Opinion in this case, Mr. Lawson was not alone in deciding to use a second barrier cuff to improve the containment properties of a diaper. Kenneth Enloe also experimented with adding a BLC. Unlike Mr. Lawson, however, Mr. Enloe opted to use a liquid pervious material to form the BLCs and obtained United States Patent No. 4,704,116 (the " '116 patent") for this innovation. *See id.* at 583–84. There is no dispute that the '116 patent constitutes prior art and discloses each of the elements contained in the Lawson claims at issue, with the exception of the liquid impermeable limitation on the material used to form the BLCs.

Mr. Enloe obtained the '116 patent on his second patent application. *See* [Plaintiff's Trial Exhibit ("PTX") 28]. Paragon premises its section 102(g) argument on Mr. Enloe's initial patent application and initial invention disclosure. In his initial invention disclosure, Mr. Enloe indicated that a liquid impervious material could be used to form the BLC, even though other types of materials are preferred. *See P & G,* at 584. Although Mr. Enloe's initial patent application did not claim a specific embodiment employing liquid impermeable BLCs, it did contain a generic BLC claim, i.e., a claim which did not limit

the type of material to be used to form the BLCs. *See id.* at 584–85. The patent examiner rejected this claim, as well as several others, as being anticipated by U.S. Patent No. 4,490,148 to Beckestrom. *See id.*

Upon rejection of these claims, Mr. Enloe abandoned his initial patent application, opting not to appeal his case or argue the rejection, or amend the rejected claims. *See id.* at 585. Mr. Enloe instead filed a new patent application, which ultimately resulted in the issuance of the '116 patent. *See id.* Mr. Enloe's new application did not include a generic BLC claim; rather, each of the claims in the '116 patent contained the limitation that the BLC be formed from a fluid or liquid pervious material. *See id.*

Paragon presented no evidence at trial that after abandoning his initial application, Mr. Enloe ever disclosed the use of liquid impermeable BLCs to the public or actually reduced this invention to practice. The Court therefore found that Paragon failed to satisfy its burden of establishing by clear and convincing evidence that Mr. Enloe did not abandon, suppress, or conceal his conception of a disposable diaper employing liquid impervious BLCs.

■ In arguing that the Court should reconsider this holding, Paragon asserts that the issuance of the '338 patent constitutes new evidence which establishes that Mr. Enloe did not abandon, suppress, or conceal his alleged invention of a disposable diaper with liquid impermeable BLCs. Through a series of continuation and continuation-in-part applications, the '338 patent traces its roots back to Mr. Enloe's initial patent application. Like Mr. Enloe's initial application, the '338 patent contains several claims describing absorbent articles with BLCs which do not place any limits on the BLC material.[4] Par-

---

**3.** For a full discussion of the Lawson patent, *see* P&G, 989 F.Supp. at 563–65.

**4.** For example, claim 1 provides:

1. An integral disposable absorbent article comprising:
a liquid pervious topsheet having a top surface;
a backsheet connected to the topsheet;
an absorbent core disposed between the topsheet and the backsheet;

a pair of elastically contractible gasketing cuffs, each disposed adjacent to a longitudinal edge of the absorbent article;
*a pair of barrier cuffs*
   (a) each barrier cuff having a proximal edge and a distal edge, and
   (b) each barrier cuff being disposed inboard of one of the gasketing cuffs; and
means for tensioning the barrier cuffs, to space a portion of the distal edge of each barrier cuff away from the top surface of the topsheet,

agon relies on these claims in asserting that the Court should modify or reconsider its conclusion that Paragon failed to establish that the Lawson claims at issue are anticipated under section 102(g).

P & G responds that the '338 patent is not a proper basis for modifying the judgment or granting Paragon a new trial because it is not newly discovered evidence. P & G points to the fact that the immediate parent to the '338 patent, Enloe U.S. Patent No. 5,415,-644 (the " '644 patent"), also contains generic BLC· claims. P & G asserts that Paragon could have advanced the same argument at trial with respect to the '644 patent that it now raises based on the '338 patent.

Like its offspring, the '644 patent contains several claims which describe absorbent articles comprising BLCs without placing a limitation on the material to be used to form the BLC. *See* [Defendant's Trial Exhibit ("DTX") 1078].[5] The '644 patent issued on May 16, 1995, during the discovery phase of this case, and is listed on Paragon's trial exhibit list. *See* [Docket Item ("D .I.") 242, § 9, at 64]. Paragon attempted to offer the file history of the '644 patent at trial for another purpose, but the Court ultimately excluded it due to Paragon's failure to lay a foundation for its admissibility. [Tr. 2900–01, 3063–68, 3215–16, 3250]. Thus, the record in this case conclusively establishes that Paragon was aware that Mr. Enloe later obtained a patent containing generic BLC claims, yet inexplicably failed to raise the argument advanced in the present motion at trial. Accordingly, the Court finds that the '338 patent is cumulative of evidence that was available to Paragon at trial. The '338 patent therefore does not constitute new evidence warranting the modi-

fication of the judgment in this case or the grant of a new trial.

Moreover, the existence of the '338 patent would not have changed the outcome of the Court's conclusion that Paragon failed to establish that Mr. Enloe abandoned, suppressed, or concealed his initial patent application and invention disclosure. The seminal case on abandonment, suppression, and concealment is the Court of Appeals of the District of Columbia's 1898 decision in *Mason v. Hepburn,* 13 App. D.C. 86 (D.C.Cir.1898). That case involved an interference proceeding between two rival patent applicants for a gun clip. The evidence established that Mason conceived of the invention and built a working model in 1887. *Id.* at 88–89. Apparently not impressed with the value of the invention, Mason laid the invention away disclosing it only to several members of the company for which he worked. *Id.* at 90–91. Hepburn independently invented the clip in 1894 and obtained a patent on it in September 1894. *Id.* at 88, 91–92. Upon learning of Hepburn's patent, Mason exhumed his invention and filed a patent application in December 1894. *Id.* at 88, 90.

The court upheld an award of priority to Hepburn based ˙on Mason's intentional or negligent concealment of his invention from the public and Hepburn's subsequent entry into the apparently unoccupied field. *Id.* at 93–94. To reach this result, the court created a new doctrine grounded in the constitutional foundation of the patent system, the promotion of the progress of science and the useful arts. The court opined that the public interest

> imperatively demands that a subsequent inventor of a new and useful manufacture or improvement who has diligently pur-

---

whereby a channel is formed by the two barrier cuffs and a portion of the topsheet between the barrier cuffs.

[Docket Item 309, at A13] (emphasis added).

**5.** For example, claim 1 of the '644 patent provides, in relevant part:

1. An integral disposable absorbent article comprising:

a pair of barrier cuffs,
  (a) each barrier cuff having a proximal edge and a distal edge,

  (b) each barrier cuff being disposed inboard of one of the gasketing cuffs,
  (c) at least a portion of each barrier cuff being attached to the top surface, and
  (d) a central portion of the distal edge of each barrier cuff being directed, by means of said portions being attached to the top surface, toward the longitudinal centerline of the integral disposable absorbent article, between the gasketing cuffs of the integral disposable absorbent article. . . .

[DTX 1078, at 7:32–60].

sued his labors to the procurement of a patent in good faith and without any knowledge of the preceding discoveries of another shall, as against that other, who has deliberately concealed the knowledge of his invention from the public, be regarded as the real inventor and as such entitled to his reward.

*Id.* at 95.

The *Mason* doctrine, embodied in 1952 in section 102(g), has been applied numerous times in the intervening years to cases in which there is an intentional concealment or unduly long delay after the first inventor's reduction to practice. These decisions balance the patent law's policy favoring the first person to conceive of an invention against equitable considerations that arise in favor of the person who first gives the public the benefit of the knowledge of the invention. *See Paulik v. Rizkalla*, 760 F.2d 1270, 1275 (Fed.Cir.1985); *Young v. Dworkin*, 489 F.2d 1277, 1280 (C.C.P.A.1974). The Federal Circuit summarized these decisions as follows:

> in each case where the court deprived the de facto first inventor of the right to the patent, the second inventor had entered the field during a period of either inactivity or deliberate concealment by the first inventor. Often the first inventor had been spurred to file a patent by news of the second inventor's activities. Although "spurring" is not necessary to a finding of suppression or concealment, the courts' frequent references to spurring indicate their concern with this equitable factor.

*Paulik*, 760 F.2d at 1275 (citation omitted).

The evidence before the Court places this case squarely within the rule announced in *Mason*. Mr. Enloe filed his initial patent application on July 2, 1984. Mr. Enloe abandoned this application on November 11, 1985, by failing to respond to an Office Letter from the PTO indicating the rejection of the claims in the application. [D.I. 236, at 45]. In January 1985, Mr. Lawson independently conceived the idea of using a second barrier cuff to control leakage in disposable diapers. [Tr. at 784–90; DTX 184, ¶ 13]. Mr. Lawson filed a patent application for this invention on October 11, 1985, and the Lawson patent issued on September 22, 1987. [PTX 1]. As

will be discussed below, Mr. Enloe revived the generic BLC claim contained in his initial patent application for the first time in an application filed over a year after the Lawson patent issued.

Paragon offers no explanation for Mr. Enloe's decision to omit his generic BLC claim from his second patent application or the approximately three year delay before he decided to resurrect this claim. There is no evidence that the delay was for the purpose of perfecting the invention set forth in this claim or that Mr. Enloe made any effort during this period to disclose this invention to the public. To the contrary, the evidence suggests that Mr. Enloe abandoned his generic BLC claim with no intention of resuscitating it until Mr. Lawson obtained his patent extolling the virtues of a liquid impermeable BLC design.

As the '116 patent demonstrates, Mr. Enloe did not think that there was any value to a liquid impermeable BLC. The '116 patent teaches away from the use of a "waterproof" design, noting that waterproof BLCs can cause urine, moisture, and liquid fecal material to collect next to the skin of the wearer and cause skin irritation. [PTX 28, at 2:33–54]. Significantly, the Enloe patent does not indicate that the use of fluid pervious flaps results in the sacrifice of one benefit—containment—for an improvement in another—the decrease in skin irritation. Instead, the Enloe patent teaches that the use of fluid pervious flaps achieves both benefits, decreasing the potential for skin irritation while "enhanc[ing] the containment and absorption of urine and other fluid body exudates, such as liquefied fecal material." [PTX 28, at 2:42–61]. Thus, the Enloe patent suggests that Mr. Enloe did not believe that there was any benefit to the use of a liquid impermeable material to form the BLCs.

Paragon, however, argues that *Mason* and its progeny are inapplicable to the present case because, unlike the inventors in those cases, Mr. Enloe made it to the patent office prior to his abandonment of his invention and, through a series of continuation and continuation-in-part applications, timely and successfully resuscitated his invention pursuant to 35 U.S.C. § 120. As set forth on the

first page of the '338 patent, Mr. Enloe filed his initial patent application July 2, 1984. [D.I. 309, at A1]. Prior to the abandonment of proceedings on the first application, Mr. Enloe filed a continuation-in-part application on October 11, 1985 ("App.# 2"). *Id.* This continuation-in-part application resulted in the issuance of the '116 patent. *Id.*

Three months prior to the issuance of the '116 patent, Mr. Enloe filed a continuation application on August 13, 1987 ("App. # 3"). *Id.* This continuation application also resulted in the issuance of a patent. *Id.*

During the pendency of App. # 3, Mr. Enloe filed a continuation application on September 9, 1988 ("App.# 4"). *Id.* Although this application was ultimately abandoned, Mr. Enloe timely filed a continuation application on February 13, 1989 ("App.# 5"), which resulted in the issuance of the '644 patent. *Id.* On May 9, 1995, one week prior to the issuance of the '644 patent, Mr. Enloe filed the application that resulted in the '338 patent ("App.# 6"). Paragon contends that pursuant to section 120, both the '644 and the '338 patents and all that is disclosed therein are entitled to the filing date of Mr. Enloe's initial patent application, notwithstanding *Mason*, by virtue of this series of timely filed continuation and continuation-in-part applications.

■ Section 120 provides in relevant part: An application for patent for an invention disclosed ... in an application previously filed in the United States ... which is filed by an inventor ... named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application. . . .

35 U.S.C. § 120. Contrary to Paragon's contention, however, section 120 complements rather than supplants the *Mason* doctrine. Under section 120, for an inventor to be entitled to benefit from the filing date of an earlier application when there has been one or more intervening applications in the inter-

im, each of the intervening applications must disclose the invention at issue. *Dart Indus., Inc. v. Banner,* 636 F.2d 684, 688 (D.C.Cir.1980)("Under section 120, no claimed subject matter is entitled to the benefit of the filing date of an earlier application unless that subject matter has been disclosed in every intervening application relied upon to establish a chain of copendency"); *In re Schneider,* 481 F.2d 1350, 1356 (C.C.P.A. 1973); *Application of De Seversky,* 474 F.2d 671, 673–75 (C.C.P.A.1973); *Cosden Oil & Chem. Co. v. American Hoechst Corp.,* 543 F.Supp. 522, 531 (D.Del.1982); *see also Application of Lund,* 54 C.C.P.A. 1361, 376 F.2d 982, 988 (1967)(stating that a "continuation-in-part application is entitled to the filing date of the parent application *as to all subject matter carried over into it from the parent application,* whether for purposes of obtaining a patent or subsequently utilizing the patent disclosure as evidence to defeat another's right to a patent") (emphasis added).

■ In the present case, several of the intervening applications between Mr. Enloe's initial application and the applications that resulted in the '644 and the '338 patents did not contain generic BLC claims. Paragon asserts that Mr. Enloe's generic BLC claim first resurfaced in App. # 4, which was filed on September 4, 1988. Even if this were the case, Paragon cannot establish that the generic BLC claims contained in the '644 and the '338 patents are entitled to the filing date of Mr. Enloe's initial application, because these claims were not disclosed in intervening Apps. # 2 and # 3. Thus, under section 120, the generic BLC claims contained in the '644 and the '338 patents are entitled only to the filing date of App. # 4. App. # 4, however, was filed almost one year after the issuance of the Lawson patent, and almost three years after the filing of the application that resulted in the Lawson patent. *See* [D.I. 1]. Accordingly, the '644 and the '338 patents are not prior art references to the Lawson patent under section 120.

The Court therefore rejects Paragon's assertion that the *Mason* doctrine does not apply to this case by virtue of section 120. Accordingly, the Court finds that the exis-

**414**

tence of the '338 patent would not have changed the outcome of the Court's conclusion that Paragon failed to establish that Mr. Enloe abandoned, suppressed, or concealed his initial patent application and invention disclosure.

## B.

■ In its second ground for relief, Paragon contends that this Court should vacate its Order granting summary judgment on Paragon's antitrust counterclaim and reopen discovery on this counterclaim. Paragon premises this contention on certain Kimberly–Clark ("K–C") documents which were allegedly wrongfully withheld until after this Court's dismissal of the antitrust counterclaim. Paragon states that it first discovered the K–C documents at issue in November 1996, during discovery in litigation between it and K–C in the United States District Court for the Northern District of Texas. According to Paragon, these documents suggest an unlawful conspiracy between P & G and K–C to engage in an unreasonable restraint of trade in violation of the Sherman Act. Paragon states that these documents demonstrate that it did not get fair discovery on its counterclaim and that further discovery is necessary because K–C continues to wrongfully withhold potentially relevant evidence.

Paragon's antitrust counterclaim was brought pursuant to sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Paragon's antitrust allegations stem from two agreements between P & G and K–C entered into after years of litigation.[6] In these two agreements, P & G and K–C, *inter alia,* settled a number of patent disputes and granted each other worldwide immunity from suit regarding the patents covered by the agreements. The first of these agreements further reserved to P & G and K–C the right to make their own decisions about licensing their respective patent rights.

In response to P & G's motion for summary judgment, Paragon alleged that these agreements created a "patent pool" which constitutes an unreasonable restraint of trade. In addition, Paragon asserted that there was an informal, unwritten expansion of these agreements to charge the private label manufacturers an excessive licensing fee for the use of the patents subject to the agreement.

In dismissing Paragon's antitrust counterclaim, the Court indicated that to survive summary judgment, Paragon must produce "direct or circumstantial evidence that reasonably tends to prove the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Houser v. Fox Theatres Management Corp.,* 845 F.2d 1225, 1232 (3d Cir. 1988) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). The Court further stated that to do this, Paragon must show that P & G acted against its economic interests and had a motive to enter into the agreements. *Id.* Finding that Paragon presented no evidence that any of P & G's activities were against its economic interests and that no inference of concerted activity to monopolize the diaper industry could be gleaned from the P & G/K–C settlement agreements, the Court concluded that Paragon failed to create a genuine issue of material fact that P & G intended to monopolize trade. The Court therefore held Paragon's antitrust allegations to be insufficient as a matter of law.

In response to the present motion, P & G asserts that these documents are not an appropriate basis to vacate summary judgment on the antitrust counterclaim under Rule 59 because they were known to Paragon before trial and thus do not constitute "newly discovered evidence." Paragon responds that its Rule 59 motion on this issue was timely

---

6. Paragon also claimed that P & G has a wrongful policy of soliciting and obtaining United States letters patents which are excessive in number and virtually inextricable from each other and from the prior art. Paragon asserted that this "patent thicket" has the effect of decreasing competition and creating barriers to entry and continued participation in the market. The Court granted summary judgment on this aspect of Paragon's antitrust counterclaim, finding that Paragon made no allegation that P & G actually monopolized or threatened to do so and that this claim was foreclosed by the *Noerr–Pennington* doctrine. Paragon does not challenge this holding in its Rule 59 motion.

made because the Court did not designate its Order granting summary judgment on the antitrust counterclaim as a "final judgment" under Rule 54(b). According to Paragon, the Court's failure to make a Rule 54(b) designation in this Order resulted in the merger of this decision with the final entry of judgment for both appeal and Rule 59 purposes.

Although Paragon is correct in its characterization of the effect of the Court's failure to make a Rule 54(b) designation in its Order granting summary judgment on the antitrust counterclaim, Paragon's argument misses the point. P & G's contention is not that Paragon's Rule 59 motion is untimely as to this issue or that Rule 59 is an improper vehicle for challenging the Court's decision granting summary judgment on the antitrust counterclaim. P & G instead argues that the K–C documents in question do not constitute a proper basis for vacating this decision under Rule 59 because these documents are not newly discovered.

To grant Rule 59 relief based on newly discovered evidence, the moving party must show that the evidence was discovered after the trial and that it could not have been discovered before the trial through the exercise of due diligence. *Compass Tech.*, 71 F.3d at 1130; *Stewart v. Walbridge, Aldinger Co.*, 162 F.R.D. 29, 30–31 (D.Del.1995), *aff'd* 82 F.3d 406 (3d Cir.1996). It is clear that if the evidence "was in the possession of the party before the judgment was rendered it is not newly discovered and does not entitle the party to relief." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2859, at 302–03 (2d ed. Supp.1998).

By Paragon's own admission, it discovered the documents in question in November 1996, 3 months before the trial in this action, 6 months before the completion of post-trial briefing, and over one year prior to

the Court's Opinion and Order entering judgment in this action.[7] Inexplicably, Paragon failed to raise this argument or bring the existence of these documents to the Court's attention prior to the entry of judgment.[8] Although Rules 59 and 60(b) recognize that new evidence may warrant the extraordinary remedy of reopening a judgment on the merits after its entry, it does not permit a party to sandbag its adversary with evidence or arguments available prior to trial in an effort to needlessly prolong the litigation or in a vain attempt to salvage a victory already lost. Accordingly, as the K–C documents relied on by Paragon in its Rule 59 motion were in Paragon's possession prior to trial in this action, they do not constitute newly discovered evidence and thus do not present a proper basis for vacating the dismissal of Paragon's antitrust counterclaim.

In addition, the Court finds that the K–C documents relied upon by Paragon are not probative of Paragon's antitrust claim against P & G. The portions of these documents cited by Paragon pertain solely to the actions of K–C. For example, Paragon points to the fact that K–C executives advocated taking steps to discourage or make unsuccessful entry by new competitors and regarded Paragon's expected entry into the market as a "storm cloud on the horizon" that should be recognized "right now." [D.I. 325, at Exh. 5, at 3; Exh. 8, at 5–6].

These documents, however, neither describe any actions on the part of P & G that are suggestive of unreasonable trade practices nor evidence an unlawful conspiracy between P & G and K–C. To the contrary, far from suggesting concerted activity between P & G and K–C, the documents address K–C's sole efforts to increase or maintain its market share via-a-vis P & G as well as private label manufacturers.

7. The Court finds it significant that Paragon attributes blame for its delayed receipt of the documents only to K–C. Paragon does not allege that P & G engaged in any wrongdoing in connection with the alleged withholding of these documents.

8. The Federal Rule of Civil Procedure clearly permitted Paragon to raise this argument upon discovering the documents. Rule 54(b) provides that in the absence of a designation by the Court

of a non-final order as the entry of final judgment, "the order ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." The discovery of new evidence that would alter an earlier ruling is a basis for revising a non-final order under Rule 54(b). *See* 10 James Wm. Moore, *Moore's Federal Practice* § 54 .25[4], at 54–86 to 54–87(3d ed.1998).

In a 1988 document, K–C's President noted that "[r]ight now were kicking [P & G] around pretty good and it feels great", and described his vision of the future for K–C as "uncontested leadership in the diaper business, i.e., HUGGIES will be to diapers what KLEENEX is to facial tissue." *Id.* at Exh. 8, at 2, 6. Further, in an April 1993 K–C planning document, K–C outlines as part of its overall strategy to "[i]ncrease product preference versus private label *and P & G.*" *Id.* at Exh. 9, at 3 (emphasis added).[9] Moreover, in an interoffice memorandum discussing the negotiations leading up to the 1992 settlement, a Paragon executive expressed his distrust of P & G, stating that "[i]n negotiating with P & G it is imperative in the future that all proposals for settlement be confirmed in writing and that oral representations by any P & G official not be accepted at face value." *Id.* at Exh. 11. The K–C documents thus do not support Paragon's claim that P & G and K–C conspired to control interstate markets; rather, they contradict this claim.

In essence, Paragon makes a blind allegation of a conspiracy between P & G and K–C, adduces documents that address only K–C's trade practices, and argues that these documents evidence P & G's violation of the antitrust laws and justify reopening discovery. The Court will not permit Paragon to engage in this sort of bootstrapping absent some evidence that there in fact was a conspiracy. As Paragon has produced none, these documents are not probative of Paragon's antitrust counterclaim. The Court therefore finds that Paragon has not produced a basis for vacating its dismissal of Paragon's antitrust counterclaim or reopening discovery.

## C.

■ At trial, Paragon tendered into evidence portions of P & G's "Proposed Findings of Fact and Conclusions of Law," [hereinafter "Proposed Findings"], filed in a suit between P & G and K–C in the Western District of Washington. In post-trial briefing Paragon asserted that paragraphs 98 and 153 of this document supported the conclusion that Paragon's accused diapers did not infringe the Lawson patent. The document offered into evidence, however, omitted paragraphs 98 and 153. The Court therefore did not consider these paragraphs in resolving the issue of infringement of the Lawson patent. *See P&G*, 989 F.Supp. at 574 n. 14. Paragon asserts in the present motion that the Court should have taken judicial notice as to these paragraphs and should now consider them to avoid substantial injustice.

Paragraphs 98 and 153 pertain to the "Cleveland diaper" which was the name that P & G gave to the first diaper containing BLCs that it sold nationally. [Tr. at 125]. Paragraphs 98 and 153 provide in relevant part:

> 98. The Cleveland PAMPERS flap material is a unitary composite material consisting of hydrophobic nonwoven polypropylene fabric and polyethylene film....

> .    .    .    .    .

> 153. The Cleveland PAMPERS diaper operates opposite to these teachings since the nonpervious Cleveland flap is made from one layer of hydrophobic nonwoven material and a second layer from liquid impervious and waterproof polyethylene film.

[D.I. 309, at A229, A243]. Paragon asserts that P & G's ascription of the "liquid impervious" label to the polyethylene film as opposed to the hydrophobic nonwoven material constitutes a judicial admission that the hydrophobic nonwoven material in the accused diapers, which is uncoated with a polyethylene film, is not liquid impermeable, a necessary element of each of the Lawson claims at issue.

The Court disagrees with Paragon's characterization of these paragraphs. The Court

---

9. Paragon places significant emphasis on an earlier reference in the same document to "[c]onsider" forming "alliances" to broaden its patent estate. *Id.* at Exh. 9, at 2. Paragon characterizes this as a self-evident reference by K–C to allying itself with P & G. As P & G points out, however, the word "consider" indicates that no alliances had yet been formed and the plural usage of "alliances" contradicts Paragon's claim that this refers to P & G. Given the fact that K–C refers to P & G only as a competitor in the document, the Court finds Paragon's characterization of the "alliances" reference to be wholly unreasonable.

finds that these paragraphs do not address in any way the performance characteristics of nonwoven polypropylene materials like those used in Paragon's accused diapers. This Court rejected a similar argument in its December 30, 1997 Opinion, with respect to Paragon's reliance on several P & G internal documents which indicated that a BLC coated with a polyethylene film passes less fluid than an uncoated BLC. *See P&G,* 989 F.Supp. at 574–75. As this Court noted, the contention that an uncoated BLC can never be liquid impermeable is directly contrary to the teachings of the Lawson patent. *Id.* Likewise, P & G's characterizations of the coated BLCs in the Cleveland diaper do not establish that the uncoated BLCs in the accused diapers are not "liquid impermeable" as this Court has construed that term in the Lawson patent.

Moreover, Paragon's argument ignores other paragraphs of the same document that address the performance characteristics of the uncoated BLCs used in P & G's "Seattle diaper."[10] *See* [Tr. at 117–18 (noting that the Seattle diaper was not coated with a plastic film) ]. P & G described the uncoated fabric used in this BLC as "liquid impervious, and water repellant." [D.I. 309, at A228]; *see also id.* at A229 ("The Seattle flaps act like dams..."). Accordingly, P & G's Proposed Findings, when viewed in their entirety, do not support Paragon's contention that this Court should construe this document as a judicial admission by P & G that an uncoated material, such as the material used to form the BLCs in the accused diapers, is not liquid impermeable.

The Court therefore finds that paragraphs 98 and 153 of P & G's Proposed Findings would not have changed the Court's conclusion that Paragon's accused diapers directly and literally infringe each of the Lawson claims at issue. Accordingly, these paragraphs do not constitute a basis for amending the judgment or awarding Paragon a new trial.

## III.

Based on the foregoing, the Court will deny Paragon's motion for a new trial or to alter or amend the judgment.

---

10. The "Seattle diaper" was the first diaper with a BLC sold in the United States. [Tr. at 117, 124–25]. It received its name because P & G first sold this diaper in a ship test in Seattle in November or December of 1988. *Id.*