In re **LABRUM & DOAK, LLP,** Debtor,

**LABRUM & DOAK,** a Pennsylvania General Partnership, Plaintiff,

v.

**John R. BROWN,** Esquire, et al.

Bankruptcy No. 98–10215DAS.
Adversary No. 98–0134.

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

Oct. 19, 1998.

Neal D. Colton, Mark E. Felger, Philadelphia, PA, for Debtor.

David Smith, Schnader, Harrison, Segal Lewis, LLP, Philadelphia, PA, Robert J. LaRocca, Philadelphia, PA, Co-counsel for Defendants.

Paul J. Winterhalter, Philadelphia, PA, for Petitioners and Former Partners' Committee.

Aris J. Karalis, Ciardi, Maschmeyer & Karalis, P.C., for Unsecured Creditors Committee.

Jay G. Ochroch, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Kean McDonald.

Frederic Baker, Philadelphia, PA, Ass't. U.S. Trustee.

## SUPPLEMENTAL OPINION

DAVID A. SCHOLL, Chief Judge.

The seemingly modest purpose of the instant decision is to fix the fees due to LABRUM & DOAK, LLP ("the Debtor"), from the cases completed by the remaining defendants ("the Defendants") in this adversary proceeding ("the Proceeding") against whom we have already entered a declaratory judgment regarding the Debtor's rights to a *quantum meruit* recovery in a previous decision of August 14, 1998, reported at 225 B.R. 93, 1998 WL 516145, at *10–*18 ("*Labrum II*"). The Defendants are JOHN R. BROWN, ESQUIRE; PATRICK GIBBONS, ESQUIRE; MICHAEL T. McDONNELL, ESQUIRE; DANIEL RYAN, ESQUIRE; and their law firm, RYAN BROWN McDONNELL BERGER & GIBBONS ("the Firm").

In *Labrum II* we required the Debtor to designate these completed cases handled by the Defendants regarding which it intended to present further evidence in order to liquidate its claims by September 4, 1998. We further scheduled a supplemental trial on September 16, 1998, to receive further evidence in support of these claims and a claim for a referral fee by Defendant WILLIAM LONGO, ESQUIRE ("Longo"). *Id.* at *18. The Debtor proceeded to timely designate the Williams, Bielun, Keller, Burke, Saracino, Maguire, and Fertal cases as the sources of its present claims. *See id.* at *15–*16.

On September 2, 1998, the Debtor also filed motion seeking discovery of the Firm's time records in all of its former cases handled by the Firm. After a hearing on this motion of September 9, 1998, we entered an order requiring the Firm to answer that discovery as to only the seven designated cases by September 11, 1998. In light of a colloquy at the hearing relating to discovery from potential expert witnesses, our September 9 order further provided that the parties

were to submit expert witness disclosures to the other simultaneously.

On September 14, 1998, the Debtor moved to continue the September 16, 1998, trial for 30 days because it had not yet obtained the expert which we had indicated in *Labrum II*, at *15, might be necessary to sustain its claims. That motion was promptly denied, because we believed that we had provided the Debtor with a carefully-timed dispensation in giving it an opportunity to present further evidence to support its claims. *Compare In re Brown*, 1998 WL 140889 (Bankr. E.D.Pa. March 24, 1998) (time structures established in *sua sponte* order allowing a party to present further evidence were strictly construed).

Nevertheless, on September 16, 1998, neither Defendants Brown nor McDonnell who, as the Defendants' attorneys who were principally responsible for the seven designated cases at issue with the Firm and were obviously necessary witnesses, failed to appear at the trial. Nor did any other witnesses, including any expert on the behalf of the Debtor, because it had not yet obtained such an expert. The explanation of Brown and McDonnell for not appearing was that they had not been subpoenaed until September 14; the subpoenas were not properly served on them; and they were presently involved in trials in forums outside of Philadelphia.

It seemed to us that Brown and McDonnell should have assumed that their presence was required on September 16 ever since we entered our order of August 14. We therefore continued the entire trial until September 23, 1998, when Brown was available, thus effectively giving the Debtor a further opportunity to retain an expert. The parties ultimately agreed that a videotaped deposition of McDonnell would be taken on Sunday, September 20, 1998, and lodged with the court in lieu of his testimony.

On or about September 16, 1998, the Debtor engaged as its expert C. George Milner, Esquire, a solo practitioner with a broad-based practice since 1965 who rents office space from the Debtor's counsel. Applications were filed by the Debtor on September 18, 1998, to retain Milner and to present his testimony by videotape due to his having a

prior engagement on September 23. The Defendants answered these applications by seeking to preclude Milner's testimony and to require his attendance at trial. On September 21, 1998, we entered an Order denying the request to present videotaped testimony, nevertheless allowing Milner to be called as a witness, and reiterating the directive of our September 9 order that any expert witness disclosures were to be exchanged simultaneously.

Brown appeared on September 23 and his lengthy testimony consumed much of that day. The court scheduled Milner's testimony for September 25, 1998. The Defendants reiterated their objection to his testimony, contending that they were inadequately prepared to cross-examine Milner and/or rebut his testimony with an expert of their own because certain expert witness disclosures provided unilaterally to them by the Debtor on September 21, in the absence of their providing any disclosures or commitment not to call an expert, did not fully comply with Federal Rule of Civil Procedure ("F.R.Civ. P.") 26(a)(2). The Defendants did not indicate whether they actually intended to call any expert witness in rebuttal, and therefore they provided no expert witness disclosures to the Debtors simultaneously with those of the Debtor's or otherwise.

After considering the Defendants' contentions, we stated, at the commencement of the September 25 proceedings, that, if they so desired, we would continue the Defendants' cross-examination and/or presentation of expert rebuttal testimony to either October 7, 1998, or October 9, 1998, thereby curing the Defendants' claims of lack of sufficient prior notice to prepare for Milner's testimony. *Compare Brown, supra.* In response to this offer, the Defendants opted to cross-examine Milner directly after his testimony and not to call any rebuttal witnesses. Therefore, at the close of that hearing, we directed the parties to submit supplemental briefs by October 2, 1998 (the Debtor), and October 9, 1998 (the Defendants).

The Defendants prefaced their brief with an extended discussion protesting our allowing the supplemental hearing to take place, on several grounds, which merit brief discussion. One argument is that because the Debtor defended a writ of mandamus pending in the Third Circuit Court of Appeals on the Defendants' unsuccessful jury demand, *see Labrum II, supra,* at *2, by stating, on July 13, 1998, that this trial, conducted from June 8 to June 11, 1998, was over, they should be judicially estopped from now participating in this supplement to the June trial.

 This argument might have some appeal if (1) the pleadings filed in the mandamus proceedings had been made part of the record in the Proceeding; and (2) it had been proven that the Debtor made contrary averments in the mandamus pleadings while knowing full well that the instant record would be supplemented, or that it intended to request such relief. That is because, in *Ryan Operations, G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 361 (3d Cir.1996), the court established that judicial estoppel entails a two-part inquiry: (1) is [the party charged with estoppel's] present position inconsistent with a position it [previously] asserted ... and (2) if so, did [the party charged] assert either or both of the inconsistent positions in bad faith—i.e., with intent to play fast and loose with the court. Only if both prongs are satisfied is judicial estoppel an appropriate remedy.

 The second part of the judicial estoppel "inquiry" requires that the party charged know that its alleged inconsistent statements are in fact inconsistent. *See, e.g., In re LaBrum & Doak, LLP,* 1998 WL 404301, at *3 (Bankr.E.D.Pa. July 15, 1998) (denying a motion to dismiss another proceeding in this case which had been initiated at the request of the Defendants). Here, however, the supplemental trial of September 1998 in the Proceeding was provided for *sua sponte* by this court. No request for any such disposition was made by the Debtor, as the Defendants note elsewhere in their brief in arguing that the Debtor meant to rest its case in June. Therefore, if the Debtor made the statement attributed to it in the course of the mandamus proceeding in July 1998, it had no reason to know or even expect that this court would allow the record to be supplemented. As a result, in no sense was it or could it be

established that, in making such a statement, the Debtor intended to "play fast and loose" with this court or the Court of Appeals. Consequently, the judicial estoppel argument must fail.

Apart from erroneously implicating the Debtor in effectively reopening the record to accept further testimony before liquidating its fee claims, the Defendant vigorously protested this court's action in doing so, citing *Compass Technology, Inc. v. Tseng Laboratories, Inc.,* 71 F.3d 1125, 1130–31 (3d Cir. 1995); and *EEOC v. Westinghouse Electric Corp.,* 925 F.2d 619, 631 (3d Cir.1991). However, neither of these cases present a situation where a trial court was found to have improperly reopened the record of a trial prior to rendering a final decision. In *Compass Technology* the appellate court held that the trial court abused its discretion by *not* reopening the record to allow an important witness to testify. 71 F.3d at 1130–31. *Westinghouse* involved the issue of whether a record should be reopened on remand after a final discussion had been rendered by the trial court which was reversed on appeal. 925 F.2d at 627–31.

This court thusly restated the law applicable to reopening of a record by a trial court prior to its rendering a final decision somewhat comprehensively in *In re Orfa Corp. of America (Del.),* 115 B.R. 799, 806–07 (Bankr. E.D.Pa.1990):

> A motion to reopen a case is addressed to the sound equitable discretion of the trial court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330–31, 91 S.Ct. 795, 802–03, 28 L.Ed.2d 77 (1971); *Brown v. Wright,* ..., 588 F.2d [708,] at 709–10; [ (9th Cir.1978) ]; *Rochez Bros. v. Rhoades,* 527 F.2d 891, 894–95 & n. 6 (3d Cir.1975); 6A J. MOORE, [FEDERAL PRACTICE], ¶ 59.04[13], at 59–33 to 59–38 [(2d ed.1989)]; and 75 AM. JUR.2d 243–44 (1974). In exercising its discretion on such a motion, a court must weigh "the interest of fairness and substantial justice," 6A J. MOORE, *supra,* ¶ 59.04[13], at 59–35, the burdens placed upon the parties and their witnesses, undue prejudice resulting from granting or denying the motion, and whether granting

or denying the motion would facilitate judicial economy. *Rochez Bros., supra,* 527 F.2d at 894 n. 6.

> A court may act *sua sponte* in reopening the record. *See Students of California School for the Blind v. Honig,* 736 F.2d 538, 548, *reh'g en banc denied,* 745 F.2d 582 (9th Cir.1984). Where significant post-trial developments have occurred, denial of such a motion may be an abuse of discretion. See *F. v. F.,* 358 A.2d 714, 716 (Del.1976).

■ It is established in this Circuit that a trial court properly exercises its discretion when it sua sponte reopens a record

> for the purpose of satisfying its own judgment and conscience as to the important question of damages, ... to arrive at a correct conclusion in this important matter.

*J.W. Paxson Co. v. Board of Chosen Freeholders of Cumberland Co.,* 201 F. 656, 661 (3d Cir.1912). *Accord, e.g., Honig, supra,* 736 F.2d at 548–49; and *Reserve Plan, Inc. v. Arthur Murray, Inc.* 38 F.R.D. 23, 35 (W.D.Mo.1965), *vacated on other grounds,* 364 F.2d 28 (8th Cir.1966). *Cf. Rochez Bros., supra,* 527 F.2d at 894–95 & n. 6; and *Joy Technologies, Inc. v. Flakt, Inc.,* 901 F.Supp. 180, 181–83 (D.Del.1995) (orders reopening records were responsive to motions of a party).

■ The burden of an additional day and a half of trial were minimal. Any prejudice to the Defendants was overcome by allowing their witness-attorneys to expound at length on their own particular view-points, as Brown did, and by allowing the Defendants a substantial period of time to frame a rebuttal, a right which they eschewed. We believe that the interests of fairness and substantial justice have been served by this directive because the *LaBrum II* decision was essentially one of first impression on the issue of liability, and we are committed to deciding this matter fairly and equitably on a full record. We found that, although the record made in June was not without probative evidence on the issue of the precise sums due to the Debtor and we could have rendered a decision awarding the Debtor more or less fees than we ultimately do on its basis, the

evidence was not as clear as it might have been. *See Labrum II,* at \*15–\*16. We did not wish to render any aspect of our decision on the basis of guesswork if this could be avoided.

Before turning to the only relevant issue of the measurement of the fees due to the Debtor, the Defendants launch a few other misguided missiles calculated to eliminate the Debtor's claims in their entirety. At the outset the Defendants attempt to justify the equities of their general intransigence in this matter by describing themselves as victims of the selfish destruction of the Debtor by their former colleagues, John Salmon, Peter Neeson, and Stephen Springer. Since Neeson became, somewhat reluctantly, the Debtor's dissolution partner, the Proceeding is characterized by the Defendants as an attack by the guilty against the innocent.

It is perhaps easy for lawyers, who must often advocate for their clients, to fall into this pattern in analyzing unfortunate circumstances which have innocently befallen them. However, we must observe that this is an involuntary bankruptcy case which was initiated not by Neeson, *et al.,* but by six former partners of the Debtor whose names have not surfaced as sided with any party in this litigation. See *In re LaBrum & Doak, LLP,* 222 B.R. 749, 752 (Bankr.E.D.Pa.1998) ("*LaBrum I* "). Moreover, Salmon, Neeson, and Springer are among the targets of two other major adversary proceedings arising out of this case, *id.* at 753, they will in all probability be called to answer for any wrongdoings on their parts.

More significantly, the beneficiary of this litigation will be the Debtor's estate. Distribution of the assets of this estate may extend to general creditors, but is unlikely to extend to any partners. Thus, in no sense do the potential wrongdoings of others justify the Defendants' defense in the face of law against them on the particular issue of the Firm's liabilities in the Proceeding.

Turning finally to the merits, the Defendants persist in inapt generalizations, such as an assertion that the Debtor, by basically allowing the new firms of its former attorneys to handle cases and matters previously handled by these attorneys as employees of the Debtor, abandoned its clients and/or "wrongfully" withdrew from the cases or matters previously handled by the Debtor. We do not consider the Debtor's procedures for reassigning its cases to have been irresponsible to clients. Nor, by assigning these matters to parties best able to eliminate their own potential liability, does the debtor appear to be chargeable with taking unfair advantage of its former employees. Rather, it is the best way we can conceive for handling the perhaps untimely but nevertheless very real death of the Debtor, which creates potential liability for its partners. We note that, if the hands of any parties are unclean in this affair, it is irresponsible to wipe them off on the shirts of the Debtor's creditors.

■ The Defendants attack Milner's testimony as a whole as procedurally and substantively deficient. The procedural deficiency arises from his failure to produce a pre-testimonial report, pursuant to F.R.Civ.P. 26(a). We reiterate our observation at page 166–67 *supra* that any prejudice to the Defendants was more than cured by our offer to allow the Defendants two weeks to prepare cross-examination and rebuttal evidence, especially since Milner was introduced to this case only about a week before he testified. We perceive the Defendants' failure to take advantage of this offer not as a courtesy to the court or an unprecedented gesture towards the end of preserving estate assets, but as a recognition that the substance of his testimony could not be rebutted.

The attack on substance appears to us to represent an attempt to attribute talismanic significance to a "ten-factor test" in deciding is legal, *quantum meruit* claim applied by Magistrate Judge Rueter in *Paul v. Horton,* 1996 WL 297572, at \*8 (E.D.Pa. May 22, 1996), and referenced in *LaBrum II,* at \*14–\*15. The Defendants seem to argue that, unless the Debtor was able to prove every one of these ten factors, it could not successfully assert a *quantum meruit* claim against them for its share of fees. Since Milner did not acknowledge this ten-factor test, nor consider many of its elements in formulating his opinions, he is labeled as incompetent.

However, although this ten-factor was referenced in *Labrum II*, we did not mean to imply that this test applied here to any significant degree. In no sense did we mean to imply that all ten factors had to be proven in any or all of the cases at issue to justify an award to the Debtor.

The *Paul* factors applied very nicely to resolution of the case before Magistrate Rueter, a suit by an attorney whom his client perceived as not only not helpful but as obstructive in achieving his ends. 1996 WL 297572, at *3–*6. In support of this test, *Paul* cites *Mulholland v. Kerns*, 822 F.Supp. 1161–1169 (E.D.Pa.1993); and *In re Trust Estate of LaRocca*, 431 Pa. 542, 546, 246 A.2d 337, 339 (1968). *Mulholland* involved a suit by an attorney discharged because of his client's perception that he was abrasive to other parties and overly concerned about recovery of his fee. 822 F.Supp. at 1165–66. *LaRocca* involved a fee petition against an estate trust, in which the client disputed the amount of the fee relative to the size of the estate. 431 Pa. at 545–46, 246 A.2d at 339.

Disputes similar to these at issue in *Paul*, *Mulholland*, and *LaRocca*, i.e., claim of attorneys for fees larger than dissatisfied clients are willing to pay, have been resolved, under Pennsylvania law, with the application of much simpler tests than the ten-part *Paul* test, e.g., the four factors considered by Judge Fox of this court in *In re Smith*, 76 B.R. 426, 431 (Bankr.E.D.Pa.1987). *Cf.* Annot., *Circumstances Under Which Attorney Retains Right to Compensation Notwithstanding Voluntary Withdrawal from Case*, 53 A.L.R.5th 287, 305 (1998) (a three-factor test is synthesized from a review of all American jurisdictions). No multi-factor test at all was put to use in the other principal authority cited in the Defendants' prior brief, *Agresta v. Sambor*, 1994 WL 70347 (E.D.Pa. March 1, 1994).

The instant Proceeding involves a dispute quite distinct from those at issue in the foregoing cases and commentary. As far as we can tell, each of the clients involved in the instant cases regarding which the Debtor's share of the fees in dispute received competent service and is not disputing either the quality of service nor the fee charged. The sole issue presented is how these fees should be divided among the various entities who worked on them. While the ten factors recited in *Paul* and the lesser number cited by other authorities are somewhat relevant to this determination, they are not relevant to a very significant degree. Nothing stated in *Labrum II* was meant to suggest to the contrary. We merely expressed our view that some additional evidence, focusing on the issue of the proper allocation of the fees in question, would be helpful to us in quantifying the share of fees and costs due to the Debtor in the relevant cases.

The testimony of Milner was very helpful to the court in several respects. While Milner did not purport to provide a micro-analysis of the cases similar to the intense detail appearing in Brown's testimony, he was able to present a clear and logical macro-analysis of the general issue of referrals in contingent-fee cases which we found very helpful in framing our judgment order. In substance, we deduce that Milner testified in support of the following principles applicable to the Philadelphia legal community:

1. The typical contingency fee is one-third of the net amount recovered by the client, after deducting costs advanced, which are always paid first to the party which advanced them, from the client's gross recovery.

2. It is presumed that a referral fee of one-third of the fee recovered, plus all costs expended by the referring party, is to be paid to the referring party simply for making a referral, without an expectation or consideration that the referring party has actually performed any useful services on behalf of the client.

3. If the referring party has in fact performed useful services in the case, the fee generated will be prorated between the referring party and the party to whom the referral is made, although the latter party generally is entitled to retain at least half of the fee, particularly if the matter goes to trial.

4. Only one referral fee of one-third of the fee recovered is payable per case. Secondary referrals generally receive only a part of the one-sixth portion of the fee remaining

after one-third is allocated to the primary referring party and one-half is allocated to the party receiving the case.

These are, in many respects, entirely different principles from the factors cited in *Paul, Mulholland,* and *Smith.* The factors enunciated in those cases came into play in applying these principles only in making the assessments of the usefulness of the referring party's services in those cases involving the third and possibly the fourth principles of the four which we have deduced from Milner's testimony.

In this regard, we note that only Brown and McDonnell provided qualitative testimony regarding these services. To the extent that the credibility of these parties is an issue, we find them credible on the whole, but definitely inclined to denigrate the work of others or even their own work while at the Debtor to an excessive degree.

Although the four principles cited above are obviously subject to modification by specific agreements between the parties, their overall, residual validity is supported by numerous other aspects of the record in addition to Milner's testimony. First, we note that attorneys Longo and Bernard were deemed entitled to one-third referral fees in the Saracino and Bielun cases, respectfully, even by the Defendants, although no testimony regarding useful services performed by either of them in these cases was adduced. The form contingency-fee agreement prepared by Brown for the Debtor was consistent with these principles, *see Labrum II,* at *13, as were the terms of the agreement which Ryan negotiated with Edwin F. McCoy, Esquire, when McCoy left the Debtor in 1995. *Id.* at *6. There is no evidence which we can recall to the contrary. We therefore totally disagree with the Defendants' contentions that Milner's testimony is unsupported or lacking necessary foundation in the record.

The observation that, in other contexts, *e.g.,* the circumstances of Longo and Bernard and the negotiation of the McCoy agreement, the Defendants were parties to payments of referral fees reveals the contrived, makeweight nature of the Defendants' brief invocation of the Pennsylvania Rule of Professional Conduct ("R.P.C.") 1.5

bar to fee-sharing as a principle in their favor. As the Comment to the Rule indicates, in referencing a "division of fee .... most-often ... used when the fee is contingent and the division is between a referring lawyer and a trial specialist,"

> Paragraph (e) permits the lawyers to divide a fee if the total fee is not illegal or excessive and the client is advised and does not object. It does not require disclosure to the client of the share that each lawyer is to receive.

Since the fee divisions directed hereinafter are in contingent fee cases, and do not increase the total fees which the respective clients agreed to pay, the total fee is clearly not illegal or excessive, per the Comment's interpretation of R.P.C. 1.5(e). We therefore will proceed to quantify the fees properly due to the Debtor in each of the seven cases at issue.

■ Williams involved an elderly woman who asserted a medical malpractice claim. She was a client of the Debtor for about three years on whose case the Debtor expended $9504.95 in costs and 528.5 hours. A short time after taking over the file, McDonnell of the Firm, having expended $5812.39 in costs and 358.6 hours, and after one day of trial, settled the case for $135,000. Milner testified that the Debtor was entitled to one-third of the fee on account of the referral; the Firm was entitled to at least half of the fee, particularly because a trial was commenced; and that the remaining one-sixth should be apportioned according to the hours expected. Crediting McDonnell's testimony that much of the Debtor's services were not useful, we will allot the Debtor only about one-third of the total time spent, raising it share of the total fee to 40 percent. Our calculation (all figures rounded to nearest dollar) is as follows:

| | |
|---|---|
| Gross Recovery | $135,000 |
| Costs—Debtor | $ 9,504.95 |
| Firm | $ 5,812.39 |
| Net Recovery | $119,683 |
| Total Fee | $ 39,894 |
| Debtor's Fee | $ 15,958 |
| Debtor's Recovery | $ 25,463 |

■ Keller involved a products-liability case in which the client's fingertip was severed by an allegedly defective saw. The Debtor expended 567 hours and $9,244.57 in costs. The Firm expended $1013.55 in costs and 76.1 hours of time. This matter was settled by the Firm prior to trial for $70,000. Brown testified, however, that much of the Debtor's early work was non-productive and that the case had been rescued from a non-suit by the intervention of Perry Bechtle, a respected retired member of the Debtor who was never associated with the Firm. Milner testified that the entire fee should be divided in half, which proposal we accept, since the time dedicated by the Debtor, albeit that much of it was not useful, greatly exceeded that expended by the Firm. Our calculation of the Debtor's share of the fees and costs is therefore as follows:

| | |
|---|---|
| Gross Recovery | $70,000 |
| Costs | |
| Debtor | $ 9,244.57 |
| Firm | $ 1,013.55 |
| Net Recovery | $59,742 |
| Total Fee | $19,914 |
| Debtor's Fee | $ 9,957 |
| Debtor's Recovery | $19,200 |

■ Burke involved a devout Catholic couple. The husband was injured while working at a church bingo hall. While a clients of the Debtor, the Burkes insisted in pursuing a malpractice claim, which was found to lack merit. Near to the time of the dissolution of the Debtor and the running of limitations as to the church, Brown finally convinced the clients to at least file and attempt to raise a claim against the church, which they did with great reluctance. The matter against the church was settled for $144,000. The Debtor expended 201.9 hours and $870.34 in costs. The Firm utilized 47.5 hours and $519.43 in costs. Milner testified that, in light of the Debtor's pursuit of a "dry hole" in the malpractice claim, it should receive only the one-third referral fee. This result seems logical, and is effected in the following calculation:

| | | |
|---|---|---|
| Gross Recovery | | $144,000 |
| Costs | | |
| Debtor | $ | 870.34 |
| Firm | $ | 519.43 |
| Net Recovery | | $142,610 |
| Total Fee | | $ 47,527 |
| Debtor's Fee | | $ 15,842 |
| Debtor's Recovery | | $ 16,712 |

■ Maguire involved an elderly woman who, after imbibing in alcoholic beverages, fell on a restaurant sidewalk. The Debtor expended 653 hours and $11,336.92 in costs. The Firm expended only 70.4 hours and $390.71 in costs, but McDonnell testified that much of the expenditures by the Debtor were wasted, some on an expert whose adverse reputation rendered him useless. The case was settled for $65,000. Milner suggested dividing the fees equally, in deference to McDonnell's testimony. In further deference to this testimony and to offset possibly useless expenses, we will reduce the Debtor's share of the fees to 40 percent. Our calculations are hence as follows: (A three-factor test is synthesized from a review of all American jurisdictions).

| | |
|---|---|
| Total Recovery | $65,000 |
| Costs | |
| Debtor | $11,336.92 |
| Firm | $ 390.71 |
| Net Recovery | $53,272 |
| Total Fee | $17,757 |
| Debtor's Fee | $ 7,103 |
| Debtor Recovery | $18,440 |

■ Fertal involved yet another elderly woman who was injured in a fall, on this occasion at a shopping center. The Debtor expended $439.47 in costs and 143.6 hours on this case. The Firm contributed $1500.42 in costs and 83.5 hours of services. The case was settled for $45,000. Milner suggested dividing the fees equally. This resolution seems justified under these facts. Our calcu-

lation of the amount due to the Debtor is therefore as follows:

| Total Recovery | $45,000 |
|---|---|
| Costs | |
| Debtor | $ 439.57 |
| Firm | $ 1,500.42 |
| Net Recovery | $43,060 |
| Total Fee | $14,353 |
| Debtor's Fee | $ 7,176 |
| Debtor's Recovery | $ 7,616 |

] The largest total recoveries were effected in the Bielun and Saracino cases, but the Debtor's share of the fees in both cases are adversely affected by the presence of prior referral attorneys who are entitled to the respective primary referral fees. Bielun was a medical malpractice action seeking to recover for injuries suffered by the client during physical therapy. Bernard, who was never associated with the Debtor, has already been deemed entitled to a one-third referral fee from the Firm even though he brought the case to the Debtor just before a trial poised for nonsuit. The Debtor expended 322 hours of time and $5,842.85 in costs. The Firm devoted 581.8 hours and $35,387.51 in expenses. In an arbitration trial of the matter, the client was awarded over $3 million, although only $1 million covered by insurance was paid. Milner highly commended the Firm's result and stated that, since the Firm tried the case, only a referral fee was recoverable by the Debtor. However, since the primary referral source was Bernard, the Debtor's recovery was only as a secondary source and hence to just a portion of one-sixth of the fee after according the Debtor half the fee for trying the case and one-third to Bernard. In these circumstances, we will allow the Debtor to recover only five percent of the fee. Our calculations therefore are as follows:

| Total Recovery | | $1,000,000 |
|---|---|---|
| Costs | | |
| Debtor | $ | 5,842.85 |
| Firm | $ | 35,387.51 |
| Net Recovery | $ | 958,770 |
| Total Fee [1] | $ | 319,590 |
| Debtor's Fee | $ | 16,479 |
| Debtor's Recovery | $ | 22,322 |

] The final matter involved Saracino, a medical malpractice claimant. This is the matter in which Longo, a former associate of the Debtor, has a now-agreed right to a one-third primary referral fee. The Debtor devoted 901.2 hours and $15,901.27 in costs to this case. The Firm committed 317 hours and $17,009.53 in costs. The case was settled for $190,000 on the second day of trial. Milner again opined that the Debtor was only entitled to its costs and a portion of the one-sixth share of the fee remaining after the Firm's one-half and Longo's one-third were deducted. Although Brown attempted to deflate even his own considerable work on this case while at the Debtor as pursuing the "dry hole" of an intentional infliction of emotional distress claim by the client's daughter, we will nevertheless value of the Debtor's claim at no less than eight percent of the fee. The calculation of the fees due to the Debtor and Longo out of this case are therefore computed as follows:

| Gross Recovery | $190,000 |
|---|---|
| Costs | |
| Debtor | $15,901.27 |
| Firm | $17,009.53 |
| Net Recovery | $158,089 |
| Total Fee | $52,696 |
| Longo's Fee apparently but he claims only | $17,565, $17,078.67 [2] |
| Debtor's Fee | $4,216 |

---

1. The Firm discloses Bernard's referral fee as $166,666 rather than the $109,863.33 which appears due under the normal calculation of this figure. Apparently, there was some particular agreement with Bernard regarding the figure due to him. We are not inclined to allow this fact, obscure as it is, to alter our analysis.

2. This figure is set forth in a Motion for clarification of our *Labrum II* order filed by Longo on October 16, 1998. We cannot explain the discrepancy, but doubt that Longo would understate the amount actually due to him. We thought our *Labrum II* order makes clear that we would liquidate Longo's claim in an order after the

Debtor's Recovery $20,117

As a result of the foregoing calculations, we conclude that the total fees to which the Debtor is entitled in these seven cases are as follows:

| Williams | $ 25,463 |
| Keller | 19,200 |
| Burke | 16,712 |
| Maguire | 18,440 |
| Fertal | 7,616 |
| Bielun | 21,818 |
| Saracino | 20,117 |
| GRAND TOTAL | $129,366 |

We will enter an Order awarding this sum to the Debtor and the $17,078.67 claimed by Longo to him.

September hearings. We will do so in our ac-

